```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE
                         NASHVILLE DIVISION
```

COOL SPRINGS PRESS,              )
a division of THOMAS             )
NELSON, INC.,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )    Case No. 3:05-0879
                                 )    Judge Echols
THE BELO COMPANY, BELO           )
CORP., and THE DALLAS            )
MORNING NEWS, L.P.,              )
                                 )
        Defendants.              )

## MEMORANDUM

Pending before the Court is Defendants' Motion to Dismiss or, In the Alternative, to Decline Jurisdiction Under the Declaratory Judgment Act (Docket Entry No. 12), to which Plaintiff has responded in opposition (Docket Entry No. 18), Defendants have replied (Docket Entry No. 25), and Plaintiff has filed a sur-reply and supplemental memorandum (Docket Entry Nos. 27 & 32).

### I. FACTUAL BACKGROUND

This is a Declaratory Judgment Action and for cancellation of a federally registered trademark which arose out of Plaintiff's publication of a book titled The Great State of Texas Almanac 2006. The title of that work bears similarity to Texas Almanac, a federally registered trademark which was owned by Defendant Belo Company at the time suit in this Court was filed. Shortly thereafter, Belo Company assigned the mark to Defendant Dallas Morning News which is owned by Defendant Belo Corp. (Docket Entry Nos. 1 ¶¶ 8, 14 & 13 at 4-5).

1

On October 3, 2005, Bryan Haynes ("Haynes"), counsel for Belo Company sent a cease and desist letter to Michael Hyatt ("Hyatt"), President of Plaintiff Thomas Nelson, Inc. ("Thomas Nelson"), the publisher of The Great State of Texas Almanac, and Roger Waynick ("Waynick"), the President of Waynick Books, Inc., which authored that work. (Docket Entry No. 17, Ex. A). In that letter, counsel informed the recipients their work violated Belo Company's federally registered trademark in the Texas Almanac. (Id.). The letter further demanded that both (1) immediately cease and desist from using "Texas Almanac" as a designation for any book or publication, (2) recall books which had been distributed but not sold, (3) provide an accounting to Belo Company within fourteen days of all such books already sold, and (4) evidence compliance with the forgoing in writing within fourteen days. The recipients of the letter were warned that failure to comply with the terms of the cease and desist letter could result in a lawsuit in which Belo Company would seek actual damages, damages based upon the profits made by the sale of The Great State of Texas Almanac, treble damages, costs and attorney's fees, and a destruction of all such infringing books. (Id.).

On October 12, 2005, and again on October 14, 2005, Haynes placed a telephone call to Hyatt to determine Thomas Nelson's intention with respect to the cease and desist letter. Both times Haynes was assured that his telephone call would be returned. (Haynes Decl. ¶ 4). On October 20, 2005, Frank Wentworth ("Wentworth"), General Counsel for Thomas Nelson, returned Haynes'

2

phone calls but did not reach him. (Id. ¶ 6). This telephone tag continued for the next several days with Haynes calling Wentworth and receiving no response and vice versa. (Id. ¶¶ 7-8).

Haynes claims that in light of Wentworth's telephone calls, he reasonably believed that Thomas Nelson was interested in settling the matter since there was never any indication that Thomas Nelson was intending to pursue its own litigation against Belo Company. (Id. ¶ 9). For that reason, Haynes decided to delay filing the lawsuit against Thomas Nelson that he had been preparing. (Id. ¶ 6). For his part, Wentworth claims that his purpose in returning Haynes' calls was to inform him that Thomas Nelson did not agree with the allegations set forth in the cease and desist letter and that it did not intend to comply with that letter. (Wentworth Decl. ¶ 3).

Suit was filed in this Court on October 27, 2005. On November 4, 2005, The Dallas Morning News filed a nine-count Complaint against Thomas Nelson, Inc., and Waynick Books, Inc., in the United States District Court for the Northern District of Texas. The Dallas Morning News alleged that The Great State of Texas Almanac infringed on the "Texas Almanac" mark in violation of 15 U.S.C. § 1125, and that publication of the work constituted unfair competition and trademark dilution, among other things. (Docket Entry No. 17, Ex. E).

## II. ANALYSIS

Defendants have moved to dismiss on the grounds that this Court lacks personal and subject matter jurisdiction.

Alternatively, Defendants argue that this Court should exercise its discretion and not entertain this Declaratory Judgment Action. Because this Court finds the alternative request to be the proper course to follow, that request will be considered first.

**A. Declaratory Judgment Action**

"Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). Thus, even though a district court may have jurisdiction, the court "is under no duty to exercise that discretion" since "[e]xercise of jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201(a) is not mandatory." Bituminous Casualty Corp. v. J & L Lumber Co., Inc., 373 F.3d 807, 812 (6th Cir. 2004)(quotation omitted).

Although a matter of discretion, this discretion "is not unfettered[.]" Id. Instead, the Sixth Circuit has adopted a five part test to determine when a district court should exercise jurisdiction over a request for a declaratory judgment:

> (1) whether the judgment would settle the controversy;
> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;
> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
> (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and
> (5) whether there is an alternative remedy that is better or more effective.

4

AmSouth Bank v. Dale, 386 F.3d 763, 785 (6th Cir. 2004). Application of those factors leads this Court to conclude that discretion would be best exercised in not entertaining the present action.[1]

### 1.  Will The Action Settle The Controversy?

This lawsuit, which had as its genesis the cease and desist letter from Belo Company, will not necessarily settle the controversy. In its most basic form, this case is different from the Texas litigation because it involves only Thomas Nelson, the Plaintiff in this action, but omits Waynick Books, Inc., the putative copyright holder in The Great State of Texas Almanac. It is also different because the causes of action in the Texas action include claims beyond federal trademark law, including common law and/or Texas state law claims for unjust enrichment, injury to business reputation, and dilution.

Quite apart from the difference in parties and nature of the claims, this case will not dispose of the entirety of the controversy between the parties, regardless of whether Plaintiff wins or loses this case. If Plaintiff fails in establishing that the mark at issue is generic, or that its use of the mark is

---

[1] It is to be noted that Plaintiff seeks a declaratory judgment that its use of the title The Great State of Texas Almanac, did not infringe on Defendants' trademark "Texas Almanac." While Plaintiff also seeks an order canceling the registration of the mark "Texas Almanac," that could only occur if it were to prevail on its request for declaratory judgment. See, Windsurfing Int'l, Inc. v. AMF Inc., 828 F.2d 755, 759 (Fed. Cir. 1987)(while 15 U.S.C. § 1119 authorizes a court to cancel registrations, it does so only in "an action involving a registered mark" and "involving" means the right to use the mark).

5

protected by the First Amendment, this result would leave open the question of what damages Defendants would be entitled to, if any. If, conversely, Plaintiff was to prevail to the fullest extent requested and the mark was ordered to be cancelled by the Court, the entire controversy between the parties would still not be resolved because Defendants have state and common law claims for damages which, at least arguably, would not be affected by any determination as to the validity of the trademark under federal law.

**2. Will The Present Action Clarify The Relations At Issue?**

"Normally, when a putative tortfeasor sues an injured party for a declaration of nonliability, courts will decline to hear the action in favor of a subsequently-filed coercive action by the 'natural plaintiff.'" <u>AmSouth</u>, 386 F.3d at 786. "This rule is subject to exception when some additional harm, not merely waiting for the natural plaintiff to sue, will befall the declaratory plaintiff in the meantime," such as where a party wants "to embark on a marketing campaign, but has been threatened with suit over trademark infringement[.]" <u>Id</u>.

In some respects, Plaintiff's declaratory action falls within the exception since the Plaintiff was marketing <u>The Great State of Texas Almanac</u> when it was presented with the cease and desist letter threatening litigation. However, this fact cuts the other way as well inasmuch as, at the time of the cease and desist letter, <u>The Great State of Texas Almanac</u> was already published and in distribution and it is therefore doubtful that the few days

6

between the filing of the suit in this Court and the suit in Texas would constitute much in the way of further harm. Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 712 (7th Cir. 2002)("It is hard to see what harm [declaratory plaintiff] would have suffered by waiting for [declaratory defendant] to sue, other than the normal uncertainty a defendant experiences while the statute of limitations is running and there is a possibility of a later obligation to pay money damages").

In this Court's view, what tips the scale in relation to this factor is the language of the factor itself: "whether the declaratory judgment action would serve a useful purpose in clarifying the relations at issue." Unquestionably, resolution of the present action would clarify part of the dispute between the parties – the validity of Defendants' mark under federal trademark law. However, as already pointed out, resolution of that issue will not resolve all of the legal issues between these parties, nor would it resolve the issues Defendants have with Waynick Books, Inc. See, Bituminous Casualty, 373 F.3d at 814 (noting that "[l]ike the first factor," although judgment would clarify legal relationship between parties, the judgment would not clarify the relationship between the defendant and an interested non-party, nor would it resolve all of the claims in the pending non-declaratory action case); TIG Ins. Co. v. Merryland Childcare, 2005 WL 3008646 at *5 (W.D. Tenn. 2005)(conflating the first two factors). Thus, this factor favors declining jurisdiction.

7

### 3. Is The Action Being Used For Procedural Fencing?

Of all of the factors, this is the one most disputed by the parties. They have polar opposite views of the events that led to the filing of the present action.

Defendants maintain that they were lulled into complacency when counsel for Thomas Nelson returned Haynes' telephone calls because they viewed this as a prelude to settlement of the matter. For its part, Plaintiff asserts that the returning of a telephone call, without any substantive message, should not have given Defendants any hope that the matter would be settled.

With regard to the issue of "procedural fencing," the Sixth Circuit has observed:

> Courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a "natural plaintiff" and who seem to have done so for the purpose of acquiring a favorable forum. Allowing declaratory actions in these situations can deter settlement negotiations and encourage races to the courthouse, as potential plaintiffs must file before approaching defendants for settlement negotiations, under pain of a declaratory suit. This also dovetails with the previous factor: where a putative defendant files a declaratory action whose only purpose is to defeat liability in a subsequent coercive suit, no real value is served by the declaratory judgment except to guarantee to the declaratory plaintiff her choice of forum - a guarantee that cannot be given consonant with the policy underlying the Declaratory Judgment Act.

AmSouth Bank, 386 F.3d at 388.

Regardless of how Plaintiff characterizes the telephone tag which preceded the filing of this declaratory judgment action, the question is "whether the declaratory plaintiff has filed in an attempt to get [its] choice of forum by filing first." Id. at 389.

8

It seems clear that Plaintiff's filing of this suit was "not to resolve issues of liability that were hindering their normal behavior, but instead to gain a procedural advantage" and that the filing "was done for the purpose of acquiring a favorable forum." Id. at 788 & 790.

It is true, as Plaintiff asserts, that this case differs from AmSouth in that here, unlike there, no actual settlement discussions occurred. However, the fact remains that the actions here bespeak of the quintessential "race to the courthouse" which is frowned upon as a proper basis for a declaratory judgment action. See, Hyatt, 302 F.3d at 712 ("as other courts have noted, the Declaratory Judgment Act is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse"); Hartford Fire Ins. Co. v. Autozone, Inc., 312 F.Supp.2d 1037, 1041 (W.D. Tenn. 2004)("the move to file here so shortly in advance of imminent joinder in Texas appears designed only to commence a race for *res judicata* or to avoid the Texas courts"). In any event, even if Plaintiff acted with a pure heart, "[t]he lack of improper motive in filing alone cannot justify the exercise of jurisdiction when all the other factors weigh on the side of declining." Bituminous Casualty Corp., 373 F.3d at 817. The third factor weighs in favor of declining jurisdiction.

**4. Will The Action Increase Friction Between Federal And State Courts?**

This factor is a non-issue in this case. Both the coercive action and the declaratory action are pending in federal court.

### 5. Is There A More Effective Alternative Remedy?

"The existence of a coercive action is important to [the Court's] determination that this declaratory judgment action will serve no useful purpose." AmSouth, 386 F.3d at 791. Here, there is no reason to suppose that the alternative remedy, that is the coercive action in Texas, will not adequately protect Plaintiff's interests. Moreover, the action in Texas already contains a claim against the author of the allegedly infringing work and contains claims under Texas law that are not contingent upon the outcome of a determination as to the validity of the mark at issue. Trial of a case which contains laws peculiar to Texas is best overseen by a Texas federal judge. See, Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft, 54 F.Supp. 1042, 1048 (D. Kan. 1999)(easier for federal judge in forum state to resolve issues implicating state law); Karofsky v. Abbott Lab., 921 F.Supp. 18, 21 fn. 4 (D. Me. 1996)(same); compare, Ayers v. Arabian American Oil Co., 571 F.Supp. 707, 710 (S.D.N.Y. 1983)("applying the law of another jurisdiction within the United States poses no particular problem to any federal forum"). This factor also weighs against entertaining the present Declaratory Judgment Action.

### 6. Summary of the Five Factors

In summary, the Court has discretion to entertain a declaratory judgment action. This discretion, however, is cabined by the five factors required to be considered. See, U.S. Fire Ins. Co. v. Albex Aluminum, Inc., 2006 WL 41185 at *2 (6th Cir. 2006)(reversible error occurs when a district court fails to apply the five factors when exercising its discretion). Except for the

10

fourth factor, which is irrelevant to the present proceeding, the factors all weigh against this Court exercising its jurisdiction.

## B. Personal Jurisdiction

As an alternative, Defendants seek dismissal of this action on the ground that this Court lacks personal jurisdiction over the named Defendants because they did not purposefully avail themselves of the privilege of doing business in Tennessee. Plaintiff asserts that if there presently exists insufficient evidence of contacts with Tennessee to hold Defendants answerable in this Court, they should be given the opportunity to conduct discovery on this limited issue.

As already indicated, this Court has determined that it will not exercise its discretion to entertain the present Declaratory Judgment Action. "It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits," Wilbur v. Locke, 423 F.3d 1101, 1105 (9th Cir. 2005), and a court may address the propriety of a Declaratory Judgment Action before the question of whether personal jurisdiction exists. Hyatt, 302 F.3d at 711. Therefore, the Court determines that the alternative request for dismissal based upon lack of personal jurisdiction is moot.

### III. CONCLUSION

On the basis of the foregoing, Defendants' Motion to Dismiss or, In the Alternative, to Decline Jurisdiction Under the Declaratory Judgment Act (Docket Entry No. 12) will be granted insofar as Defendants request that this Court decline jurisdiction under the Declaratory Judgment Act. The Defendants' alternative

11

request to dismiss this action for lack of personal jurisdiction and lack of subject-matter jurisdiction will be denied as moot.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE